First case this morning is Blees v. Coastal Service. Ms. Black. Good morning. May it please the court. This case is an appeal of the MSPB's dismissal of a petition for enforcement of a final board order. The grounds for the appeal are procedural. By departing from the appropriate procedural standards, the board acted arbitrarily and capriciously and reached its determination without procedures required by law, rule, or regulation. I wish to first of all make clear that this case is not an appeal of a determination by the MSPB of whether or not the Coastal Service conducted a RIF impacting Daniel Blees. That is a substantive determination that the board— Clearly, the administrative judge did not and could not compel a RIF, right? No, I'm sorry. The administrative judge decided the issue that Daniel Blees' position had been abolished. No, an administrative judge doesn't have the power to compel— But is that what you're seeking now? What does your client really seek as a remedy? We seek compliance with the board's first compliance order, which stated that in order to comply with the underlying remedial order, the Coastal Service was required to release Daniel Blees from his competitive level. The board found that it was no longer an option to reassign Mr. Blees to his former position because that position had been permanently abolished. That was a finding of the board that the Coastal Service never appealed. The merits of that decision are not before this court. The Coastal Service never appealed. Didn't the Coastal Service comply completely with that by restoring him to his position and paying him what he was paid before? Restoring Mr. Blees to his former position was not an option of the board's compliance order. The board's compliance order of August 6, 2004 adopted the ALJ's initial recommendation regarding compliance, finding that restoration was no longer a possibility. The position no longer existed. The administrative judge said, if there is no longer a need for such a position, why didn't the record show that the Coastal Service just decided that they would determine that there was a continuing need and place him back in his position? There was a second determination by the board that became a final, unappealed board order that was in August 6, 2004 that adopted the hearing examiner's recommendation that found that that position had been abolished. It was no longer a possibility to restore Mr. Blees to his former position. Could you show me where it says expressly that his position no longer exists and that at that point what would happen to him? He has no position. He wasn't removed. At the appendix at page 6 is the August 6, 2004 final order. At this order, as it says, the recommendation which found the agency in noncompliance with the board's final decision of March 13, 2002 and required the agency to formally release the appellant from his competitive level, effective the date of the abolishment, etc. now becomes the final decision of the Merit Systems Protection Board. That recommendation, Your Honor, is at page 80 of the appendix? And that decision says that the position no longer existed and that he had to be released. That's correct. At page 81. Because the appellant's position no longer existed, the agency could not return him to that position. So the decision that's on review here, your contention, is inconsistent with that earlier compliance decision at page… That's exactly correct, Your Honor. So why is that fatal to what the board is doing here? The board reopened the merits at this second… Well, they reopened the compliance decision. That was the final decision. That decision, too, had never been appealed. Don't they have some discretion to reopen when there's compliance going on? Don't they have some discretion to reopen it and change their mind? Well, their own cases say that they apply the law of the case. And we might also argue that this was raised judicata at that point. The Postal Service never appealed that determination. It was closed. Therefore, a second compliance decision, the only factual question that the board should have asked at that point is, did the Postal Service release Gleaves from his competitive level? Not, was there an abolishment? That was a determination that was made two decisions ago in March 13, 2002. Was there a change in his employment status, and what was it? The Postal Service introduced information that his personnel form had never been changed. So on paper, no, there wasn't a change. In reality… Was there any change in his employment status? Was he demoted? Was he somehow with his salary cut? What is it that brings you before us now as a cause of action against the agency? The cause of action is against the procedural decision by the MSPB to ignore its own procedural standards, which require it not to reopen factual determinations. The factual determination is that Mr. Gleaves was abolished. That's not before this court. Nobody appealed that determination. What would be the practical effect of a ruling in Mr. Gleaves' favor? Because as Judge Rader indicated, it does appear, if you look at the material at 126 and 127 and following of the joint appendix, it does appear, number one, that he's never been demoted, and number two, he's never been reduced in pay. So putting it in blunt terms, no harm, no foul. What's the problem here? Well, the harm here is that Mr. Gleaves' position no longer exists, no matter what it says on paper. And if the Postal Service initiated RIF procedures, then it's our belief that Mr. Gleaves would qualify for a discontinued service annuity, which is offered to an employee where, for example, the Postal Service would have to offer him another level 7 position within 50 miles of his duty station. That's a RIF. You really want a RIF, don't you? And then he'd have reassignment rights, and he could bump somebody else off, and isn't that what you're looking for? We are looking for a RIF because that's a release from this competitive level. But the administrative judge cannot order an agency to RIF. The MSPB found that the agency did RIF Mr. Gleaves, and they RIF'd him but did not allow him the protections of RIF procedure. They abolished his position. That's the final determination that's been made. It has never been appealed. Where did it find that there was a RIF? In the initial decision, they found it in March 2002, which was the underlying order. But what's happened here is that there's a dispute about the board's jurisdiction for the reasons that Judge Rader expressed, right? He says that the two board members disagreed about whether there was board jurisdiction because the change in duty in the view of Member Marshall wouldn't constitute a RIF. Am I remembering it correctly? Well, jurisdiction was not properly before the board at that point. Well, I understand, but that is the dispute. But yes, there was a disagreement between the two members sitting on the board at the time. But because there were only two members, and Member McPhee agreed that the question of jurisdiction had been finally decided and was not before the board, he also— So normally a change in duty wouldn't constitute a RIF as long as there was no change in grade of pay, right? Well, Mr. Gleaves was put in level seven—or excuse me, level four duties. The administrative judge looking at that— No, no, but my question is—forget this case for a moment. Okay. As a general matter, a RIF does not occur as long as the employee continues in the same grade of pay, right? Even though the duties are changed. This court has so ruled in haze, yes. Right. So what we have here is a situation in which the only thing that's been changed for this employee is the duties, right? That is correct. His duties have changed. So what you're really arguing is that even though the board made a mistake the first time around in finding this was a RIF because of the change in duties, the board, as Chairman McPhee argued, should stick with that jurisdictional determination. That's exactly what you're—we are arguing right now, yes. And that that determination—a factual—excuse me, a determination of jurisdiction based on facts which have not been reviewed is generally not open to collateral attack. Later on, in a defensive posture such as this, I repeat again, the Postal Service has never appealed any of these determinations. And as the Supreme Court has held in a contempt proceeding, the factual and legal determinations of the order that a party is claiming has been disobeyed are not up for reconsideration in a contempt proceeding. The sole question is did you or did you not comply? The sole factual question for an agency in a compliance decision is did you or did you not comply? In the second compliance decision here, it does appear—you may be correct that the government cannot challenge a jurisdictional issue because even though it was jurisdictional, there does seem to be authority for the proposition that raised judicata would bar the attack. But as I understood it, the government came forward in the second compliance proceeding and presented material showing that Mr. Glees had always been in this position and had never had a reduction in pay and had never been demoted, as Judge Rader was indicating. And they presented this evidence, and again, I think it's what is it, 126—and correct me if I'm wrong, if I have it wrong—but the material that's at 126 and 127 of the appendix, doesn't that constitute evidence that they could look at, the Board could look at? This was old evidence. If you look to page 54 of the appendix, this is a stipulation that the parties put before the administrative law judge in December 2001, before there was ever any determination on this case. Postal Service says—I guess it's the third bullet point down. I'm sorry, let me just catch up. You're going to page 54? 54 in the appendix. Okay. This is a joint stipulation from December 2001 put before the ALJ, before any decision was made. The agency continues to maintain the appellant as a postal data source technician on his PS 450. Above that, in the first bullet point, it says the agency abolished the appellant's level 7 position. So here, both parties have stipulated that the Postal Service didn't change the paperwork, but they still abolished the position. You're saying that even though this material that I was looking at at 126 and 127 wasn't presented until 2004, that nevertheless, it's a variance with the previous stipulation. Is that what you're saying? No, I'm saying it's exactly the same as the previous stipulation. The new evidence that's presented says we never changed his 450. He's been in this same position since 1990. Well, they've already said that from the beginning. This is nothing new here. They've also already said that he was abolished. And the Board in 2004, in November 2004, reaches a determination that because his 450 wasn't changed, he wasn't abolished. That's contrary to evidence that was before the ALJ at the outset. So this is a reconsideration of old evidence to reach a new factual determination to dismiss a petition for enforcement. Do you wish to save your bubble time, Ms. Lenton? Yes, I do. I have five minutes. Thank you, Mr. Carl. Good morning, Your Honor. This rather simple case has become a thicket of problems, and I think the quickest way to work through them is to look at the two orders that are essentially before you. The first is Acting Chairman McPhee's order, the one appealed from. And which one is that? That would be the order appealed from is the last order of the Board. I guess it's about page 2 of the appendix. Okay. That's the one that's on appeal now, then? That's the one. That is the one before you which you have to decide whether it was arbitrary and capricious. In that decision, Chairman McPhee found that the AJ ordered the agency to cancel a reassignment of the appellant from his former position. He then looked at the evidence before him, and I'll explain why he could in a minute, and found that the agency had complied. It had canceled the reassignment and was, therefore, in compliance. But there is an inconsistency between the recent decision and the initial compliance decision. The initial compliance decision found that the physician had been abolished in order that he be given his RF rights. And the recent decision says, basically, no, the physician hasn't been abolished. He's been restored to his original position. So there is an inconsistency. I don't think so, Your Honor. Well, how is that? When you look at the initial decision originally, the AJ was not focusing on the abolishment of the position. The initial compliance? The initial decision, the decision that set all this off, the decision in which we were ordered to either reinstate him or restore him. No, but I'm talking about the initial compliance decision. In the initial compliance decision, the board said the physician's been abolished. Now the board is saying it hasn't been abolished. He can be restored to his original position. That's not consistent, right? Only if you give the initial decision an odd sort of a meaning that doesn't fit the context. Who would find that initial decision? The initial decision was probably about page, I think it was around page 7 of the appendix. No, I'm sorry, that is the split decision. That's the split decision. And it will follow. It will follow. That's the initial compliance decision on page 7, right? Your Honor, it would help me a lot if I could explain to you the context in which these orders were made. Because the AJ, on the first decision, thought the issue was something different than what is being portrayed here. In the initial decision, you know from the, I'm talking about the original decision. I understand that the board may be entitled to change its mind. It may be that the board never had jurisdiction over this in the first place. I'm just trying to understand that there is a conflict here between the initial compliance decision and the second compliance decision, which is the fourth. It seems to me that's perfectly clear. What am I missing? Well, that's what I'm trying to explain, Your Honor. And to do that, I have to go back to what the AJ, you know from the AJ's citation to the Glennon position, he never meant to say, he couldn't have meant this, the board's Glennon position, he couldn't have meant to say that the Postal Service can't restore the man to his old position. He said, what he said originally was that the Postal Service is arguing that it can demote a man, it can demote an employee, hold him in a new position, and avoid RIF procedures by keeping him at the same rate of pay. That was his position. He was focusing on the fact that we had demoted, he thought, we had taken the petitioner out of his original level and put him in a new one. I'm sorry, this is not helping me understand how the initial compliance decision and the second compliance decision are consistent. The initial compliance decision said, job's been abolished, he has to be released. The second compliance decision says, position hasn't been abolished, he can be restored to it. Those aren't consistent, right? I'm telling you, no, Your Honor, he didn't say the job has been abolished, he has to be released. Well, how do you explain the language on page 81 of the appendix? I'm sorry, 81? Yes. He says the appellant's position no longer existed, the former position no longer existed. He said it twice. I'm saying it because I think his concern is also shown on 81. He says, and I'm reading from the second paragraph down, the third line, he's concerned that the agency had taken no formal action to rescind the appealed action, to rescind the demotion. This has gotten off on the wrong start because everyone is reading the initial decision as a finding that eliminating the job was a demotion. And that's not what the A.J. meant to say. He said an actual demotion is a demotion. Then we came back for the initial compliance decision. In the initial decision, he says, look, if you put the guy in a level 7 position, if you put him in a level 4 position, you've demoted him. We come back and we say for the initial compliance decision, we didn't put him, I said, all right, Judge, we've redone it. We've given him level 7 duties. He says, no, I want a formal action. You can't, that wasn't the focus of this. Let me ask you a question. Yes, sir. Let's assume that there is an inconsistency between the first and second compliance decisions as the petitioner argues. Let's just assume that hypothetically. Yes, sir. What are your arguments as to why the board should be dissenting? If there is an inconsistency, the first argument is that under 5 CFR 1201.118, the board has retained the power to review its own decisions. Our second set of arguments, assuming this inconsistency applies, exists. And I really would like to return to that, Your Honor, that the law of the case doesn't preclude reexamination of the decision. For one thing, it's discretionary. For another, this court was told in Cold Industries Operating Corp. by the Supreme Court that it had done the correct thing in not applying the law of the case to a jurisdictional problem. If the board ordered us to—if the board said restoring a man to his old position is not enough, putting him at his old level is not enough, it exceeded its jurisdiction. And I would have thought you would be arguing that the board's—that we have an obligation independently to determine the board's jurisdiction and that a change in duty is not something within the board's jurisdiction with respect to a wit. I was going to make four arguments, Your Honor, and that's the second. The first is the board was not arbitrary or capricious in examining—reexamining its jurisdiction. It had to do it unless the—under Christiansen, unless the jurisdictional question was vague. Secondly, as Your Honor anticipated, there's no way the board can bind this—especially in A.J.—can bind this court. This court has to decide whether or not to order the board to, in this case, to exceed its jurisdiction. I don't see how law of the case can do that, especially in a case like this where the lack of jurisdiction is so clear. And for that, we rely on Christiansen. This is not a closed question. I'm looking at the original decision of Judge Miller, the administrative judge. This isn't the compliance order. This is the original decision. And he says, if there is no longer a need for such a position, this is the order, the actual—what he's telling the agency. The agency may detail the appellant to another position. Well, that if clause says that if there's no longer a need, it also presupposes that if there is a need, they can keep him in his present position, right? Our reading exactly, Your Honor. So even if the position was somehow abolished, the administrative law judge said, you can still put him back in the position, of course, and then you don't have to go through a writ procedure. Isn't that exactly what happened here?  And so there's no inconsistency really. The finding that the position was abolished, whether it was accurate or not, happened before the agency complied with the order by replacing him in his position. There's no reduction in greater pay, and we're all kind of getting a little exercised over a conflict that doesn't exist. Thank you. Am I saying that right? That is our position exactly. That is what I was trying, inartfully, I think, to make the point. I'm not understanding. There certainly is no conflict with the original decision here, as Judge Rader has pointed out. But there is a conflict between this compliance decision and the original compliance decision, isn't there? No, sir. The original compliance decision rested on the fact that we had previously demoted the man and offered no formal evidence that we reinstated him. We had just come back and said, Your Honor, according to the compliance decision, we had come back and said to the board, we've simply, we've informally given him Level 7 duties. And the A.J., and more particularly the split board, that part which sided with the A.J., thought that wasn't enough. If we had demoted him, we had to formally put him back. The next time around, we came back with formal proof that he had not been demoted. And then the board was apparently content with the position, which I think Judge Rader has just seen, that this is all an argument over nothing. The A.J. had cited case law, which made it clear he thought we were entitled to return the man to his original position. When the board got the proof that we had returned the man to his original position, it said, that's it. And if there's a fault, if there's any fault prescribed to us, it's twofold. First, we didn't explain clearly that the man was grandfathered into the abolished position in the first place. And second, at the initial compliance decision, we tried to proceed on informal evidence, affidavits saying, well, we've given him Level 7 duties. If the original order that we had demoted him to a Level 4 was correct, the informal statement that, well, we've given him Level 7 duties was not adequate. We had to come back, as we did the third time around, with the official documentation showing the man had never left a Level 7 position. If you ascribe any other meaning to the situation, you have to assume that the A.J. didn't understand the very law he was citing and didn't understand this court's case law. I cannot see how, when you look at it in context, you can think that the A.J. really meant to say that if you abolish a position, but grandfather someone into it until you can find someone else for him, that's a violation of the law. If that's what the A.J. meant, if the court imputes that meaning to the A.J., then I think it has to say it's not bound by the A.J.'s mistake and the board exceeded its jurisdiction. Your Honor, I don't have anything more to say. If the court has no further questions, I'll rest. Thank you, Mr. Carl. Ms. Black, you have a little over two minutes remaining. I'm reserved five minutes, I think. You consumed some of your time. Oh, did I? Okay. Thank you. The one point I wish to make right now is that the Postal Service has argued that the position was not abolished or that that was somehow a mistake is completely disingenuous because it was the Postal Service who has argued all along, and I quote, the agency has a compelling interest for not restoring the appellant to his former position because it no longer exists. It is undisputed that the appellant's former position was abolished May 18, 2001, as the result of the implementation of the time and attendance system. Therefore, the agency cannot restore the appellant to a position which does not exist. The Postal Service has consistently argued that this position does not exist. Is he working at the same pay and the same grade? He's working at the same pay and the same grade. Is he listed as being in the same position? On paper, he is. He's sitting on his hands. He's not doing anything. You haven't alleged a constructive removal here, have you? We didn't need to because the board has twice found that he was abolished. So he's in the same position, he's getting the same pay, he's at the same grade. What do you want us to do? We want him to be released from his competitive level because that's what the board twice determined. He doesn't want his job. He's been abolished. He doesn't want his job. He doesn't really have a job right now. He's sitting on his hands. No, we've already established. He has a job, he's getting the same pay, he's at the same grade. He wants to be released from his competitive level because that would qualify him for a discontinued service annuity. He's sitting on his hands. Let me ask you this. How would he be entitled to discontinued service annuity if he's always been employed and always been paid? Because if the Postal Service released him from his competitive level, as it has been ordered to do, then the Postal Service would be required to offer him a level 7 position within 50 miles of his duty station or release him. And if he was released, then he could be free to file an application with OPM for a discontinued service annuity. We don't believe that there is a level 7 available. If there is, then he would be happy to take it. But why? I just don't understand why he wants to do that. Because he's not doing anything right now. They don't have any work for him. He goes there and he sits and he does nothing. And for him, he'd rather be retired and sitting at home doing nothing because there is no work. The work has been replaced by technology. So, I see my time is up. Thank you very much, Ms. Black. The next case is Chapman Law Firm Corporation v. The United States. May it please the Court. James DelSordo for the appellant, Chapman Law Firm. Your Honors, this matter is an appeal from a bid protest at the Court of Appeals for the Court of Federal Claims. Excuse me, I apologize. Essentially, what we're asking the Court to do is overrule the Court of Federal Claims' assertion that it was not arbitrary and capricious for the contracting officer in that matter, in that procurement, to rely on, for HUD to rely on, an offeror's assertion of intent to comply with the subcontracting limitation clause in the RFP. In the face of clear statements in the offeror's proposal that it could not or would not comply with that limitation. Essentially, we have a contract that is set aside for small businesses. It's undisputed that the RFP contained the subcontracting limitation clause, which is FAR 52.219-14, which requires that a contractor who wins such a set-aside contract perform at least 51% of the total contract effort. And it's also undisputed that the technical evaluation panel, in initially looking at the offeror's proposal, said, we can't determine whether you're going to comply with this rule or not. And there became a lot of back and forth between the offeror and the government, for the offeror attempting to assure the government that they were going to comply. And in the end, the offeror says, yes, I'm going to comply. However, at the same time, further on in their final proposal revision, they're stating that they're going to need a waiver of certain Small Business Administration rules if they don't get a particular type of mentor-protege program in place. Now, obviously, you don't ask for a waiver of something unless you consider yourself in violation of it. And just based on that, the contracting officer or the technical evaluation panel should have realized they could not rely on the blanket assertion, we're going to comply. Similarly, they looked at – they had the contract – the offeror's initial operating costs, which demonstrate quite explicitly that the subcontractor was going to perform more than 51%, close to 59% of the labor effort on this contract. And as the Court of Federal Claims has stated, in a recent case called Transatlantic Lines LLC versus United States of America, it's 68 Federal Claims, 48 is a 2005 case from last September. What is the status of the contract right now? The contract that was awarded to HMBI, the offeror, I presume is being performed. Now, it was initially stayed when we protested at the Government Accountability Office. I believe it was not stayed because the government – once we finished with the GAO, the automatic stay went out of place. The Court of Federal Claims initially held off performance for a period of time, but it has been performing since, I guess, the fall. Actually, a year ago. The fall of 2004? Yes, Your Honor. So it's been in place for a while. It has, Your Honor. But that's the nature of the – that's why we like to win these things at the Government Accountability Office with the automatic stay, but it's the nature of the beast. It takes time to process these things. But really, to rule in your favor, don't we have to, in essence, say that the government acted arbitrary, capriciously, without good reason, by relying on the representation and assurances that it had at the time, namely when it got the final proposal in response to the questions it sent out? Because it did send out a communication saying, look, we have a concern about your relationship with – what is it? The best assets, Your Honor. Best assets. I'm sorry. We're concerned about this relationship. Are you going to comply with the contract? They come back. They point out that there's a provision in the contract that says that they'll comply and so forth. I mean, aren't you asking us to overturn that kind of a decision? And wouldn't that open up the door for a lot? Not really, Your Honor, because I wholeheartedly agree that the contracting officer is not an inspector general whose job is to go out and pry through the interstices of a proposal. They're entitled to rely on the statements on the face of the proposal. However, what we have here is a general statement. We're going to comply with FAR 52.219-14. But within the same document, you have statements that utterly contradict that, one being that we're going to need a waiver of the limitation on the 50 percent rule. It depends how you interpret those statements, doesn't it? Excuse me, Your Honor. It depends how you interpret those statements. If you interpret those statements as meaning we've got a problem during the first six months of performance, there's no inconsistency between the two. Isn't that correct? Not necessarily, Your Honor, because, first of all, there's no waiver within the case law saying that, well, if you're not in compliance for the first six months, it's okay. No, but just try to answer my question. If, in fact, those statements are interpreted to mean we're not going to comply during the first six months but we'll comply with the contract overall, there's no problem here, right? No, Your Honor, because, one, you can't interpret those statements saying this. No, no, but you're disagreeing with me about the interpretation. I'm saying accept that interpretation. There's no problem. There's no inconsistency. I know you disagree with that. You really do disagree with that. I understand that. But if the other statement is read as saying we're talking about the first six months, then there's no inconsistency. There is an inconsistency, Your Honor, because there's not a you can be in noncompliance in the first six months but be in compliance in the latter six months. The contract is a meeting of two parties. The offeror has to meet all the material requirements in the RFP. One of the material requirements is the limitation on subcontracting. There are many instances where the RFP might say you have six months to comply with whatever, you have 90 days to comply with something else. In fact, in this RFP, there was particularly a 120-day transition period where not all the services were being performed. However, there is nothing to say that this limitation on subcontracting is something that's subject to some sort of transition period. But you're disagreeing with my hypothetical. My hypothetical is we reject that. We say this should be interpreted as applying only to the first six months. If that's true, there's no inconsistency, right? Your Honor, then you're overruling your own precedent. The answer is there's no inconsistency. If it's interpreted that way. You don't want it. You say that's wrong, and I understand that. I guess I don't understand the question. The question is hypothetically if they said we're not going to comply for the first six months. That's not inconsistent with compliance for the entire contract period.  Within the Federal Procurement Law, you cannot say give me a pass for six months. Well, Mr. DeSouza, it's the contract as a whole. How long is it? What's the period of the contract? There's a base year and then option years after that, four option years. And there's no guarantee that any option year would be afforded. No, I understand. But, I mean, it's the whole period of the contract. I mean, there may be, theoretically, there could be one pay period or something when someone is noncompliant literally with the 50% requirement. Don't you have to look at the whole contract in total? I would agree with you, Your Honor. If we had that situation where it was just a potential that maybe somebody quit, someone from Harrington, Marin, and Barksdale, the prime contractor quit, and then the best assets person would have to maybe fill in. But that's a situation for administration of the contract. That's not something to do with formation of the contract. When we're talking about formation of the contract, we have to have a meeting of the minds between the parties. The government says in its RFP, you must comply with this limitation. To allow someone within the body of their proposal to say, I'm not going to comply with this limitation, is to, one, give them an unfair advantage as to all the others. They're not saying they're not going to comply. They said they will comply. That's the same thing as my son saying to me, Your Honor, I'm going to clean up my room, and then I know he also says, but I'm going out to play now. Your Honor, you can say I'm going to comply, but if you also say, particularly in your labor hour figures, which are the hard data. Well, but if you say you're going to clean up the room, sometime this week, then if he goes out and plays today, he's not out of compliance. He can do it tomorrow and still comply with your requirement, right? That's what's going on here. They have to comply within the term of the contract. They don't have to comply tomorrow. They don't have to comply the next day, sometime within the term of the contract. They must be under that 50%. That is the point of the case law that talks about this being an administration of the contract issue. But my first principles is that if you say within your proposal, I cannot comply with this limitation, not limiting to any time period, just saying I cannot comply with this time, with this limitation. I need a waiver of this 50% limit. It doesn't matter if in actual practice you're going to comply. The contracting officer has to live with what is stated in the proposal. I have reserved five minutes. I want to state your rebuttal time. Thank you, Your Honor. Mr. Del Sordo, Mr. Haberbach. Thank you, Your Honor. Good morning. May it please the Court, I'd like to begin by addressing Mr. Del Sordo's assertion that HMBI had utterly contradicted its representation. It did not utterly contradict its representation that it would, in fact, comply with the limitation on subcontracting. Neither the allocation of costs nor its statement concerning its intent to seek a waiver of the Amendment to a Protégé Agreement speak to the question, which is germane to this case,  whether throughout the life of the contract at least 50% of the cost of contract performance incurred for personnel should be expended for employees of the concern. The relevant issue, as the Court has discerned, is not whether in the first 30 days or the first 60 days, I'm sorry, the first 90 days or the first six months of contract performance, whether or not the cost would be 50% or greater, but rather over the full year. But your argument is that this should be viewed as a six-month limitation because that was the only SBA requirement, right? Your Honor, the SBA requirement is not actually part of this contract. I understand, but isn't that your contention that the SBA is only concerned with the first six months? I thought that was the point you were making. The SBA regulation refers to six-month increments, but, for example, on page 1456 of the appendix where the HMBI made the statement, the question is being asked in the context of initial operating costs. And there is no statement that after the first six-month period that we're going to need a waiver, but rather in the context of what's being asked here is, we have a concern about your initial operating costs. What are you going to do about them? And the response is made that in reference to the initial operating costs, we may not receive a waiver. But by no means is that a suggestion, that throughout the life of the contract, more than 50% of the labor costs would be incurred by the subcontractor. It's also important to point out that the first 90 days, which is the basis for the breakdown of costs, are not at all reflective of what has to be performed during the typical periods of the contract, particularly if one looks at the contract as lasting for a period of years. There are a series of ramp-ups that take place during the first 120 days, such that the full effort of the contract, including the primary tasks for which HMBI is responsible, pursuant to its subcontracting arrangement, don't really get started until either, depending on how one looks at it, 90 days or 120 days after the award. In particular, the marketing activities for which HMBI is primarily responsible don't take place until after day 120. So it's certainly not surprising to find out that during the first 90 days, that a large portion of HMBI's costs won't have been accounted for during an explanation of its initial operating costs. But this language they're relying on, on page 13 of the blue brief, this is their primary reliance. This is their primary reliance. The cost sheet that you've shown is explicitly only for the first nine months or something like that. 90 days. 90 days. But they say this language at the bottom, they quote it at the bottom of page 13 of the blue brief, shouldn't be read as applying to the first six months of the contract, as you say it should, right? That's my understanding, Your Honor. So could you tell me again why we should read this statement as limited to the first six months? The primary reason is that the statement from which they're quoting on page 13 appears in two places. There are two sets of final proposal divisions, but the statement is the same. And in each question being asked, by HUD, is under the caption initial operating cost. And there's a question raised about the initial operating cost, and it's within that specific context that HMBR responds we may need to seek a waiver. And what page does that appear in? It appears on two pages. The one I have before me is 1456. 1456. Okay. Why does initial operating cost mean first six months? Well, in fact, the initial operating cost, as it's referred to elsewhere, the question that HUD asked about was, in fact, the first 90 days, which would only be three months. The first 90 days, yeah. So you say this should be read as limited to the first 90 days. I can't say that they necessarily put a pinpoint as to how long that period would last, but they were concerned that for the first six-month period, the accounting might come out such that more than 50% during the initial six-month period would be incurred by subcontractors. It's also, I think, important to note that the statement that HMBI makes isn't we're going to need to do this. What it says is if the SBA does not approve the mentor-protege relationship, HMBI will request permission from the SBA to exceed work requirement percentages for an SBA firm. Potentially, the permission could have been denied, and HMBI could have acted accordingly by rearranging what it needed to do. I think it's necessary. Is there a distinction here between the limitation on subcontracting and the small business concerns? The small business, the SBA provision, that's just a preference in the contracting. Isn't that correct? Whereas the limitation on the subcontracting is a requirement of the contract. It seems to me like Chapman here is trying to raise concerns that are relevant to its small business preference and import them over into the concerns about the contractual limit on subcontracting. Am I correct? I think that's an entirely accurate understanding. It is not necessary for purposes of this contract for HMBI to comply with the 8A requirements and that whole body of jurisprudence. It's just a preference. They get a preference if they hit the right small business numbers, right? They would, although this speaks to the 8A requirements. And this is not actually an 8A set-aside, such that it's only a small business set-aside. And the regulation that's being referred to here relates, I believe, solely to an 8A set-aside. So on some level, the court is entirely correct in suggesting that this is irrelevant, because it's on the SBA side as opposed to on the contract side. But it's even more, if that could be the case, more irrelevant, because it's not even an 8A set-aside to begin with. The other thing that I think bears noting is that it's entirely appropriate to read the representation that HMBI makes concerning its anticipated initial operating costs in the context of and in accordance with its representation on the previous page that it intends to comply with the limitation on subcontracting. On page, I believe it's 1548, HMBI makes its representation that it plans to employ at least 50% of its personnel. HMBI management team will review total costs incurred on personnel quarterly to ensure that our employees are performing at least 50% of the cost expended. HMBI, Mr. Del Sordo has suggested that the breakdown of costs to be incurred somehow contradict that. But I think a much more appropriate reading is to simply try to harmonize them and to give the HMBI the benefit of the doubt in suggesting that what it says on one page is consistent with the thing it says two paragraphs later. At a minimum, the contracting officer in any way did not act arbitrarily or capriciously in trying to harmonize these two provisions because the fundamental inquiry that the court needs to examine is whether or not it is clear on the face of the proposal that there is simply no way that HMBI can comply with the limitation on subcontracting. HMBI was in a position to comply with the limitation on subcontracting. It made the representation and to suggest otherwise would place the contracting officer in a position where it needs to somehow try to predict the future and place the government in a position of, if Mr. Del Sordo's position were correct, of deeming potential bidders not capable of performing long before they've been given a chance to do so. Such a ruling would, number one, create an insurmountable burden for the contracting officer and, number two, would subject the United States to all kinds of potential litigation concerning an improper disqualification prior to the time that the contractor had been given a chance. I have nothing further than that if the court has any additional questions. Thank you, Mr. Alibaba. Mr. Del Sordo, you have more than four minutes. Thank you, Your Honor. Now, we wholly agree that this 8A issue is irrelevant as to this contract, except to the extent that it shows HMBI's intention. We're not attempting to say that this was some sort of preference contract or that it was an 8A contract. The point is that HMBI made a mistake and assumed that there was some sort of 8A component to this contract. And in making that assumption, it made an admission that it was not going to be able to comply with the 50% rule. So whether the fact that they made it in the context of an 8A clause or something is irrelevant, except to the extent that it shows their intention. And that's what we're talking about here. They make a statement, we're going to review our operating costs every quarter to make sure that we're okay. But they say right there, if we don't get this men are protege thing, we're going to have to get a waiver of the 50%. Similarly, the only issue about the initial operating costs is that it is a window into the black box that is the relationship between the subcontractor and the contractor. The way the proposals were set up is that you didn't have to give your breakdown on your costs. However, in this one instance, the government asked the offeror, you know, your initial operating costs seem a little high. There was just a raw number that was given. So they break it down. And it's a simple arithmetic procedure to see that the subcontractor is, because the fee that's being paid to them is X, the initial operating costs are Y, that it's more than 50%. Now, I understand it's only the first 90 days, but it is a ratio. It should tell the government something, that the subcontractor is going to be doing more work than is appropriate. And I agree wholly, and everyone agrees, that the contracting officer is not tasked to pry into every nook and cranny of the proposal. But when there's something stated clearly on the face, and this is the GAO's precedent says this, and Judge Hewitt said it below, and also the Transatlantic Lines case repeated this, that the contracting officer is fully able to rely on a statement. However, if there's a contradiction, or if there's something clear on the face of the proposal that they are not going to comply with the limitations of the subcontractor, that that cannot form the basis for a successful work. Now, I understand Judge Schall's concern about the fact that a lot of water is flowing over the dam between here and now. Obviously, my client's preference would be that you overturn Judge Hewitt's decision, enter an injunction, require the contracting officer to do something further. However, in the alternative, we have asked for relief under the implied contract of fair dealing. There's also been proposal costs that can be rendered. And I bring up the implied contract of fair dealing because there does seem to be some sort of disagreement at the Court of Federal Claims as to whether that cause of action still exists. Between the lion raisings case and the unified architecture case, it would be helpful if this Court would opine on whether that cause of action still exists at this point. However, just to sum up, Your Honors, the fact that someone states we're going to comply and it's contradicted two pages later or even somewhere else in their proposal cannot form the basis for a successful board. And we would ask you to overturn the Court of Federal Claims in this instance. Thank you. Okay. Thank you very much, Mr. Del Sordo. The next case is Harrow Products International, Incorporated v. Intex Recreation.